Argued April 1, reversed and remanded May 18, rehearing denied
September 21, 1920.

# HARTMAN *v.* SELLING.*

### (189 Pac. 887; 192 Pac. 408.)

**Brokers—Commission cannot be Denied Because Brokers Received
Commission from Purchaser.**

1. In an action by real estate brokers to recover a commission
promised by a corporate stockholder if they succeeded in selling cor-
porate lands, where the stockholder's written offer referred to forma-
tion of a syndicate by the brokers, and it was uncontradicted that
he was informed the brokers would not act unless they also received
a commission from the syndicate or corporation organized, recovery
cannot be denied on the ground that the brokers received compen-
sation from the corporation organized.

**Brokers—Agreement Construed to Require Payment of Commission to
Broker Only After He Effected a Sale.**

2. Agreement by large stockholder to pay broker commission for
effecting sale of corporate lands *held,* when construed with reference
to an option contract executed by the corporation only shortly
before, to be conditioned upon payment in accordance with the
terms of the option contract.

**Brokers—Commissions Dependent on Fulfillment of Contract Terms.**

3. Where brokers sue on a contract for commission which pro-
vided for payment of commissions only on payment of the full pur-
chase price, the brokers can succeed only by showing fulfillment of
those terms, regardless of any rights they might have in another
form of action.

**Brokers—Acceptance of Notes for Less Than Amount Due not Pay-
ment Entitling Broker to Commission.**

4. Where a corporation which had sold land agreed to a settle-
ment whereby it received notes from the purchaser in an amount
less than the price agreed, but the corporation expressly stated that
such notes should not be regarded as payment, there was no payment
of the full purchase price, so as to entitle brokers to commissions
payable when the price was paid.

**Brokers—Not Entitled to Commissions from Stockholder for Selling
Corporate Lands, Payment not Having Been Made as Provided
in Contract.**

5. Where a large stockholder agreed to pay brokers a commis-
sion if they sold corporate lands and the brokers' transferred an

---

*On the question of effect of contract expressly making broker's
right to commissions dependent upon "sale" of property or other
condition beyond that ordinarily implied, see note in 29 L. R. A.
(N. S.) 533.

On right of broker to compensation upon procuring customer to
take an option, see note in 43 L. R. A. (N. S.) 91.

REPORTER.

option for purchase of such lands to a corporation which they organized, but the full price was not paid within the time stipulated, the purchasing corporation giving notes for an amount less than that due, which notes were accepted in settlement but not as payment, *held* that, notwithstanding the guardian of the stockholder who had since become incompetent represented the vendor corporation in the settlement, there was no such consummation of the contract as would entitle the brokers to recover commissions.

## ON PETITION FOR REHEARING.

**Appeal and Error—Exhibit Attached to Bill of Exceptions Considered, Where Respondents Invited Attention Thereto.**

6. Respondents, on petition for rehearing, drawing attention to option which was one of the papers physically attached to the bill of exceptions, designated by the reporter's stamp as plaintiffs' exhibits, and used by both parties in the original argument, the court will on such invitation consider it as if regularly and properly before the court as part of the record on appeal.

**Vendor and Purchaser—Option Becomes Mutually Binding Only on Terms of Offer Being Accepted.**

7. An option to buy binds only the optioner to leave the offer open for the specified time, and does not become a mutually binding contract till the one to whom it is given accepts the offer according to its terms.

**Brokers—In Absence of Other Agreement, Payment must be in Cash and at Stipulated Times.**

8. Agreement of one to pay a broker a commission, if a sale of another's land was made and the price paid as provided in an option, requires the price to be paid in cash, the option not providing otherwise, and at the times stipulated.

**Pleading—A Reply Held a Departure.**

9. The complaint alleging full performance of a contract, on the performance of which according to its terms defendant by another agreement contracted to make the payment for which the action was brought, a reply relying on a waiver and extension of time on the prior contract was a departure.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.

This is an action to recover a commission on the sale of land. The May Land Company, a corporation, owned a tract of land, embracing 725 acres, located about one mile east of the limits of the City of Portland. Emanuel May owned a majority of the shares of stock in the May Land Company, and the

97 Or.—24

extent of his stock ownership was such that, if the land sold for $295,000, his share of the purchase price would amount to $184,000. Emanuel May was the president of the May Land Company. May was anxious to bring about a sale of the land, and for several months he negotiated with J. L. Hartman and E. L. Thompson, who were partners doing business under the firm name of Hartman & Thompson, for the purpose of getting the partnership interested in handling the property. The negotiations resulted in the May Land Company giving to Hartman & Thompson, or any corporation named by them, an option, dated September 15, 1911, to purchase the tract. The partnership paid $5,000 to the May Land Company for the option, and it was expressly provided that this sum should not be considered as a part of the purchase price, even though the partners elected to purchase. The May Land Company bound itself to sell to Hartman & Thompson "or any corporation named by them to which they might sell or assign this option" for $295,000; the purchase price to be paid as follows: $45,000 on October 20, 1911; $30,000 on October 20, 1912; $50,000 on October 20, 1913; $75,000 on October 20, 1914; and $95,000 on October 20, 1915. The installments bore interest at the rate of 6 per cent per annum from and after April 20, 1912. The option further provided that if on or before October 20, 1911, Hartman & Thompson paid $45,000, the first installment on the purchase price, the May Land Company would convey the land to the Title & Trust Company, a corporation, as trustee, to be held in trust and for the purpose of securing the May Land Company "the payment of the balance of the purchase price." Although the option is dated September 15, 1911, Hartman &

Thompson paid for it by giving a check for $5,000 which was dated September 21, 1911, and cashed on the following day.

Emanuel May signed a writing, in the form of a letter, dated September 16, 1911, and addressed to Hartman & Thompson, as follows:

"I hereby agree to pay you five (5%) commission of my interest in the May Land Company, which now amounts to One Hundred Eighty-four Thousand ($184,000) Dollars, in consideration of your negotiating the sale of the land lying about one mile east of Portland, known as the May Land Tract, containing seven hundred twenty-five (725) acres.

"It is understood that you are to form a syndicate for the purchase of this land and when this sale is negotiated it will be understood that this five (5%) per cent is due and payable on or before four years providing the One Hundred Eighty-four Thousand ($184,000) Dollars is paid as provided in the contract of purchase, on or before the end of four years.

"I hereby bind myself and my heirs to carry out and execute the above agreement."

Hartman & Thompson exercised the privilege granted by the option and on October 3, 1911, they paid $45,000 to the May Land Company; and on the same day in conformity with its promise contained in the option the May Land Company conveyed the land to the Title & Trust Company as trustee.

Hartman & Thompson caused to be formed a corporation known as the Parkrose Association. Articles of incorporation were filed with the Secretary of State on October 4, 1911, the next day after the payment of the first installment on the purchase price; and the first meeting of the stockholders was held on October 10, 1911. All the subscribers to the capital stock attended this meeting of the stockhold-

ers; and among those present and voting was
Emanuel May, who held 124 shares. At this meeting the stockholders unanimously adopted a resolution authorizing the purchase of the beneficial interest of the partnership in the land for the sum of
$330,000. In this connection it is proper to say that
the resolution contains recitals about the option
given to Hartman & Thompson and the price to be
paid to the May Land Company, so that every stockholder present at the meeting was fully informed as
to the contents of the option given to Hartman &
Thompson; and, moreover, the resolution refers to
the extra $30,000 as compensation paid Hartman &
Thompson "for the expense incurred by them in the
handling of said property to this date." Hartman
& Thompson had done a great deal of work in organizing the Parkrose Association, and in preparing
the property for the market, and they had paid
$8,000 to one person, $3,750 to another, and $2,500 to
still another person for services rendered.

The stockholders of the Parkrose Association at
their first meeting, passed another resolution by
which they authorized the board of directors to enter
into an agreement with Hartman & Thompson appointing them "managing agents for the handling
and selling" of the land.

Pursuant to the authority of the two resolutions
adopted by the stockholders of the Parkrose Association, Hartman & Thompson immediately transferred all their beneficial interest in the property to
the Parkrose Association, and the partnership proceeded to act as "managing agents for the handling
and selling" of the property.

The May Land Company received from the Parkrose Association the installments due in 1912 and

1913 on the purchase price. The installment of $75,000 due October 20, 1914, was not fully paid; but on October 17, 1914, the Parkrose Association paid $25,000 on that installment, and the May Land Company extended the time for the payment of $50,000, the balance of the installment, until October 20, 1915. The Parkrose Association paid this balance of $50,000, however, on April 17, 1915. There was a considerable amount of interest due and unpaid after April 20, 1915. The Parkrose Association had disposed of probably half of the land, but, because of conditions resulting from the war, it became difficult to sell any more property and likewise difficult to collect on sales already made. The Parkrose Association offered to return the unsold land to the May Land Company in satisfaction of the balance due on the purchase price. There were negotiations between the officers of the Parkrose Association and the May Land Company. E. L. Thompson, who was president of the Parkrose Association, participated in the negotiations, apparently in his capacity as an officer of the corporation and also as a member of the partnership. At that time I. Lowengart, the secretary-treasurer of the May Land Company, seems to have been acting as the managing officer of the affairs of that company. The offer of the Parkrose Association to return the unsold portion of the land was "entirely unsatisfactory" to Lowengart, for the reason, we infer, that all the choice land had been sold and then released by the trustee, and none but land liable to overflow remained. Moreover, the attorney for the May Land Company had been consulted by Lowengart, and the attorney gave it as his opinion that Hartman & Thompson were personally liable for the balance of the purchase price. Ne-

gotiations were carried on between the interested parties until finally, the May Land Company offered to allow a reduction of $10,000 on the balance due on the purchase price, and to extend the time for payment; and an adjustment of the difficulties was made on that basis on July 14, 1915. At that time all the principal of the purchase price had been paid except $90,000, so that after allowing a reduction of $10,000 on the principal, only $80,000 as principal remained to be paid. However, interest, amounting to several thousand dollars, was due and unpaid. The adjustment was made by the Parkrose Association giving five promissory notes, dated July 14, 1915, for an aggregate of $80,608.50, payable at the times and in amounts as follows: October 20, 1916, $26,000; April 20, 1917, $13,500; October 20, 1917, $13,500; April 20, 1918, $13,500, and October 20, 1918, $14,108.50. In addition to the five notes already mentioned, the Parkrose Association gave its sixth note for $6,916.25, which, as we understand, covered interest. At the time and as a part of the adjustment the May Land Company, through its proper officers, signed a writing which reads as follows:

"In consideration of One Dollar, and the execution of five promissory notes by the Parkrose Association to May Land Company aggregating $80,608.50 and one note for $6,916.25, all payable to the May Land Company in accordance with an agreement entered into this day, the May Land Company does hereby release and discharge Hartman & Thompson from and against all claims of every name and nature that it has against the said Hartman & Thompson growing out of the sale of the lands of the May Land Company situate in Multnomah County, during the year 1911. This is not a release for liability on account of unpaid balance for stock subscriptions in Parkrose Association.

"In witness whereof, the May Land Company has caused these presents to be executed on its behalf by its president and secretary, and its corporate seal to be affixed thereto.

"Dated this 15th day of July, 1915."

The record does not tell us when this action was begun, nor does it inform us as to the amount due on the notes at the time when the plaintiffs began the action; but it does appear that at the time of the trial, March 3, 1919, the entire amount of the notes, except about $4,000, had been paid. Emanuel May was on May 19, 1915, adjudged incompetent by the County Court for Multnomah County, and Ben Selling was appointed guardian of his person and estate. Emanuel May remained incompetent and the guardianship continued until April 4, 1917, the time of his death.

The plaintiffs allege in their complaint that in order to induce them to pay $5,000 for the option, Emanuel May agreed to pay them 5 per cent on $184,000 if they succeeded in forming a syndicate for the purchase of the land, and that the agreement was subsequently reduced to writing and signed by Emanuel May under date of September 16, 1911. It is also averred in the complaint that a sale was made, within the meaning of May's promise to pay a commission, on October 10, 1911, the date when Hartman & Thompson transferred their beneficial interest to the Parkrose Association, and that the commission became due and payable on July 14, 1915, on the theory that on that date the "Parkrose Association paid and settled the balance of the purchase price of said land to the May Land Company."

This action was brought against Ben Selling and Harrison G. Platt as executors of the will of Eman-

uel May, deceased, and against Albert Feldenheimer and Joseph Simon as administrators with the will annexed.

The defendants answered by denying any liability for any commission, and by alleging two separate defenses.

In one affirmative defense the defendants say that Emanuel May employed the plaintiffs to sell the land owned by the May Land Company upon an agreement to pay a commission; that, although acting as brokers for Emanuel May, the plaintiffs were at the same time interested in and employed by the Parkrose Association, the purchaser of the property, and received from that corporation a commission of $30,000 for services rendered in connection with the purchase; that the plaintiffs did not disclose to Emanuel May the fact that they were to receive, or that they had received, a commission from the Parkrose Association.

The other affirmative defense is to the effect that the letter signed by May was executed "in consideration that the plaintiffs * * would sell for the May Land Company the real property * * for the sum of $300,000 and cause said sum to be fully paid on or before four years from September 16, 1911, time being the essence of said contract," and that, if the land should be so sold and fully paid for in four years, Emanuel May would pay to the plaintiffs a commission of 5 per cent of $184,000. The defendants allege that the plaintiffs sold the land to the Parkrose Association, but that payment for the land "was not made within the period stipulated, nor has the same been paid for yet," and that, therefore, the plaintiffs have not earned and are not entitled to demand the commission.

The complaint does not give the details of the adjustment made on July 14, 1915, but in that pleading the plaintiffs content themselves by averring simply that—

"On the 14th day of July, 1915, the said Parkrose Association paid and settled the balance of the purchase price of said land to the May Land Company."

In their reply, however, the plaintiffs recite that all the purchase price had been paid, "and that on the fourteenth day of July, 1915, there was then unpaid on said purchase price the sum of $80,608.50," and that on that day the Parkrose Association and the May Land Company agreed that the latter "would accept the promissory notes of the said Parkrose Association in payment for said land"; that with the knowledge and consent of Emanuel May the Parkrose Association gave its notes to the May Land Company, and at the same time the May Land Company signed a release exonerating Hartman & Thompson from any personal liability for the balance of the purchase price; and that, since "all of said action was taken by the May Land Company with the full knowledge and consent and acquiescence of Emanuel May," the defendants are estopped from claiming that the payments were not made within the time specified in the original contract. With the consent of the parties the cause was tried by the court without the intervention of a jury. A trial resulted in findings and a judgment for the plaintiffs for $9,200, and from this judgment the defendants appealed.                    REVERSED AND REMANDED.

For appellants there was a brief over the names of *Messrs. Dolph, Mallory, Simon & Gearin* and

*Messrs. Platt & Platt,* with an oral argument by *Mr. Joseph Simon.*

For respondents there was a brief over the names of *Mr. John H. Hall* and *Mr. Jesse Stearns,* with an oral argument by *Mr. Hall.*

HARRIS, J.—1. The plaintiffs, it will be recalled, paid $5,000 for the option, and the purchase price was fixed at $295,000, making a total of $300,000. The plaintiffs transferred their beneficial interest in the land for an expressed consideration of $330,000. However, the plaintiffs did not actually receive $330,000 from the Parkrose Association; but they were reimbursed the amount paid for the option and also the amount of the first installment, totaling $50,000; and in addition the plaintiffs received $30,000. The plaintiffs were engaged by the Parkrose Association to act as selling agents, and for such services they received a commission from the Parkrose Association on all the lots and acreage sold by them. Receipt of these moneys from the Parkrose Association cannot prevent the plaintiffs from recovering a commission from the defendants. In his agreement to pay a commission, Emanuel May says to the plaintiffs: "You are to form a syndicate for the purchase of this land." The uncontradicted testimony is to the effect that the plaintiffs told him that they could not undertake to handle the property, unless they were paid a commission by Emanuel May, and also "a 10 per cent cost for organizing" a company, or a "syndicate," as they sometimes called it, to take over the property. In other words, May knew at the time he signed the writing promising to pay a commission exactly what the

plaintiffs planned to do, and that a part of such plan included the creation of a corporation to which the option was to be assigned; and, indeed, May understood that the plaintiffs would not attempt to handle the property unless they could do just what subsequently was done. Moreover, May was present and voted at the meeting of the stockholders of the Parkrose Association when, with a knowledge of the whole truth, a resolution was unanimously adopted authorizing the purchase of the option from the plaintiffs; and, afterwards, according to the uncontradicted evidence, May acknowledged that the plaintiffs had a just claim for a commission.

2. The other defense is founded upon the contention that the promise to pay a commission was conditioned upon the payment of all the purchase price within four years, and that, since all the purchase price was not paid within four years, the plaintiffs are not entitled to recover. The defendants argue that the four years period began on September 16, 1911, and that time was made the essence of the agreement. The plaintiffs go on the theory that the four years period began to run on October 10, 1911, the time when they transferred the option to the Parkrose Association. The option signed by the May Land Company and the plaintiffs, under date of September 15, 1911, does not make time the essence of the contract, except as to the payment of the first installment; the writing signed by May under date of September 16, 1911, and in which he agrees to pay a commission, does not declare that time shall be of the essence of the agreement; no writing found in the record in terms speaks of time as of the essence of the contract, except the option; and in that paper, as already explained, only the time for the

payment of the first installment is declared to be "of the essence of this option"; and, therefore, it cannot be said that the parties expressly stipulated that time should be of the essence of the agreement for the payment of the commission.

When attempting to ascertain what Emanuel May intended when he wrote "on or before the end of four years," the letter in which he used that language should be construed in the light of the provisions found in the option. Although the option was not delivered until September 21, 1911, it was evidently prepared on or before September 15, 1911, for on it appears that date; and in view of the fact that all the details had for a long time been discussed by May and Thompson, it is obvious .that May knew what the option contained, or would contain, when he signed the letter dated September 16th, which it will be observed is the day following the date of the option. It is appropriate to add that the option was signed by May as president, and by Lowengart as secretary of the May Land Company.

In his letter, May agrees to pay a commission "on my interest in the May Land Company," and he declares that his interest "now amounts to $184,000." The litigants here agree that, if $295,000 is fixed as the purchase price, May's share would amount to $184,000. The option fixed $295,000 as the price to be paid for the land, and manifestly May had in mind this price named in the option when in his letter he said to the plaintiffs: "You are to form a syndicate for the purchase of this land," and "when this sale is negotiated" (sale to the syndicate), the commission of 5 per cent on $184,000 is due and payable on or before four years, provided "the $184,000 is paid" as provided in the contract

of purchase, on or before the end of four years. Within the meaning of May's letter a sale was negotiated on October 10, 1911, the date when the option was transferred to the Parkrose Association; but the commission, according to the letter, is not due and payable unless "the $184,000 is paid as provided in the contract of purchase." The language last quoted makes it plain that the option which, although not delivered and possibly not yet signed on September 16th, had on or before the previous date been prepared, was "the contract of purchase" to which May referred. If the four years period be calculated from the date of the option, or from the date of the transfer of the option to the Parkrose Association, the period within which the installments were required to be paid extended beyond four years; but if the time be calculated from October 20, 1911, the date when the first installment was absolutely required to be paid, the four years period ended on October 20, 1915, the date when the final installment became due. It seems clear to us, however, from the language employed in May's letter, that he in effect intended to say that if the purchase price fixed in the option should be paid within the time fixed by the option, he would pay Hartman & Thompson a commission of 5 per cent on $184,000.

3-5. The plaintiffs' alleged right to a commission is based upon a contract plus performance of it. The writing of September 16, 1911, is the contract, and in this contract the obligation to pay a commission is in effect made dependent upon the payment of the purchase price on or before October 20, 1915. The plaintiffs aver in unequivocal terms in their complaint that the Parkrose Association paid the balance of the purchase price on July 14, 1915. In

other words, the adjustment which was made on July
14th is relied upon by the plaintiffs as payment of
the balance of the purchase price, and therefore as
performance or fulfillment of the condition.

It is true that in their reply the plaintiffs say that
Emanuel May consented to the adjustment made on
July 14th, and that, therefore, the defendants, as his
representatives, are estopped to deny payment. The
plaintiffs do not claim that May personally con-
sented to the adjustment, but they take the position
that consent was given through his guardian Ben
Selling. Having been adjudged incompetent May,
of course, could not act for himself or for the May
Land Company in the adjustment on July 14th. In
the settlement made on July 14th, Ben Selling repre-
sented the May Land Company as vice-president, and
as such he signed the release given by that company
to Hartman & Thompson. Selling was at that time
guardian of the person and estate of Emanuel May,
and, because of that circumstance and the fact that
Selling participated in the adjustment, the plaintiffs
insist that May must be deemed to have consented to
the adjustment. There is no evidence in the record
showing that Ben Selling was acting or pretending
to act in his capacity as guardian when the adjust-
ment was made. It is not necessary, however, to
decide whether Ben Selling's participation in the
transaction of July 14th operated to estop the de-
fendants to deny performance of the contract; for in
their brief the plaintiffs expressly disclaim any in-
tention to rely upon waiver, or modification of the
contract, or estoppel, but they stand upon the ground
that the purchase price was paid on July 14, 1915.
The theory of the complaint is that the conditions of
the contract were fulfilled and that the giving of the

notes operated as payment. This is the theory of the findings and conclusion of the trial court, and it is likewise the theory contended for by the plaintiffs on this appeal. The obligation to pay a commission was by the terms of the letter made dependent upon the payment of the purchase price; and, having sued on the contract according to its terms, the plaintiffs can succeed in this action only by showing fulfillment of those terms: *Cranston* v. *West Coast Life Ins. Co.*, 63 Or. 427 (128 Pac. 427).

The judgment rendered by the trial court is predicated upon the notion that when Hartman & Thompson paid the first installment of $45,000, they, by that act, transformed a mere option to purchase into a binding obligation on their part to complete the purchase by paying the remaining installments; and that, by the adjustment of July 14th, the May Land Company released the plaintiffs from their obligation, and in lieu of it accepted the notes from the Parkrose Association. An examination of the option will disclose that it does not contain even a word attempting to obligate Hartman & Thompson to pay any moneys at any time. The plaintiffs do not in the option promise to pay any moneys whatsoever. At no time could the May Land Company have sued Hartman & Thompson and recovered from them any part of the purchase price. There is nothing in the record to show that the Parkrose Association promised to pay any moneys prior to the execution of the six notes. It is true that, until they transferred the option to the Parkrose Association, Hartman & Thompson had the right to pay, but they were not obliged to pay; and, so too, until the execution of the notes, the Parkrose Association had the right to pay,

but it was not obliged to pay. When, therefore, the Parkrose Association gave its notes to the May Land Company, it did not, by giving these notes, pay the debt of Hartman & Thompson, for the reason that neither the Parkrose Association nor Hartman & Thompson were indebted to the May Land Company. It was not a transaction in which one obligation was given and accepted in lieu of another obligation, but it was a transaction by which an obligation was created where none existed before.

Moreover, before receiving the notes, the May Land Company expressly stated that the notes should not be regarded as payment of the indebtedness; and, consequently, the notes cannot be treated as payment: *Riner* v. *Southwestern Surety Ins. Co.,* 85 Or. 293, 299 (165 Pac. 684, 166 Pac. 952). A meeting of the board of directors of the May Land Company was held on July 14, 1915, "for the purpose of considering an adjustment of differences with the Parkrose Association and with Hartman & Thompson." The minutes of this meeting show the purpose for which it was held, and they contain a recital of the amount of the unpaid balance of the purchase price. The minutes also state that the Parkrose Association "would give notes" for $80,608.50, and an additional note for $6,918.25 as evidence of the interest, provided the May Land Company "would release Hartman & Thompson from and against all claims of every name and nature that it has against the said Hartman & Thompson growing out of the sale of the lands of the May Land Company"; and then the minutes declare that—

"The notes referred to are to be taken only as evidence of the indebtedness, and the securities held for

the indebtedness are to remain in the Title & Trust Company as heretofore."

The minutes close by stating that the vice-president and secretary are authorized to accept the notes of the Parkrose Association and to give a release to Hartman & Thompson. A copy of these minutes was delivered to the Parkrose Association, and that corporation placed the copy in its own minute-book. If the recorded minutes of the May Land Company, knowledge of which was admittedly brought to the Parkrose Association, speak the truth, the May Land Company took the position that both the Parkrose Association and the partners were liable for the balance of the purchase price; for we read in the minutes as follows:

"The board informally discussed all negotiations previously had with representatives of the Parkrose Association, and the May Land Company was claiming that there is due, owing and unpaid from said association and from Hartman & Thompson, growing out of the sale, * * the sum of $90,608.50 with interest from October 20, 1914."

There is no evidence to show that Hartman & Thompson admitted at any time prior to July 14, 1915, that they were personally liable for any of the purchase price; and, as we have already stated, they were not in truth personally liable. It does appear, however, that the May Land Company was claiming that both the Parkrose Association and the partners were liable, and hence, on the basis of the position taken by the May Land Company, one of two joint debtors was released; but the debt was expressly preserved and was not paid, although reduced in amount and evidenced by promissory notes. At no time during the negotiations which culminated in the

97 Or.—25

adjustment of July 14, 1915, did Ben Selling pretend
to act in his capacity as guardian of May; and,
therefore, it cannot be said that May, through his
guardian, agreed with the plaintiffs that the notes
should operate as payment. The most that the
plaintiffs contend for is, not that the guardian
agreed, but that he is estopped to say that he did
not agree. Neither the Parkrose Association nor
May, acting through his guardian, agreed that the
notes paid any actual or supposed debt. The pur-
chase price was not fully paid when this action was
commenced, nor was it paid at the time of the trial.
Payment of "the one hundred eighty-four thousand"
was made one of the conditions of the contract, and
that condition had not been performed even at the
time of the trial; nor, indeed, had all the purchase
price, as reduced, been paid; and, consequently, hav-
ing failed to show performance of this material con-
dition, the plaintiffs cannot recover in this action.

It may be that, if the notes are now fully paid, the
plaintiffs can compel payment of a commission, not-
withstanding the fact that a comparatively small re-
duction was made in the purchase price, and even
though the time for payment of that reduced balance
was extended beyond the four years period; but if,
in these circumstances, the plaintiffs are entitled to
a commission, they cannot compel the payment of
such commission in this action on the pleadings as
they now are.

There is a sufficient bill of exceptions within the
rule established in *Malloy* v. *Marshall-Wells Hard-
ware Co.*, 90 Or. 303 (173 Pac. 267, 175 Pac. 659, 176
Pac. 589).

The judgment is reversed, and the cause is remanded for such further proceedings as may be consistent with this opinion.

REVERSED AND REMANDED.

McBRIDE, C. J., and BENSON and BURNETT, JJ., concur.

---

Denied September 21, 1920.

ON PETITION FOR REHEARING.

(192 Pac. 408.)

*Mr. John H. Hall* and *Mr. Jesse Stearns* for the petition.

*Messrs. Dolph, Mallory, Simon & Gearin* and *Messrs. Platt & Platt, contra.*

BURNETT, J.—Substantially, this is an action to recover a real estate brokers' commission for effecting a sale of land. In the former opinion by Mr. Justice HARRIS, after a discussion of the issues in the case, he arrived at the conclusion that the plaintiffs "cannot compel the payment of such commission in this action on the pleadings as they now are."

6. In the petition for a rehearing, the plaintiffs renew their attack upon the bill of exceptions, contending in substance that there was no sufficient record before the court upon which to base the conclusion reached. The bill consists of a report by a stenographer of all that was said by witnesses, court, and counsel during the trial of the case, annexed to which are several documents, numbered with the Circuit Court number of the case and stamped with the

reporter's stamp, designating them as Plaintiffs' Exhibits "A," "B," "C," etc. All of these exhibits were introduced in evidence by the plaintiffs and are alluded to in the report of the testimony by apt descriptions. At the oral argument before us counsel on both sides referred to and used these very exhibits thus attached to the bill of exceptions. That document is signed by the presiding judge, who declares that it was settled, signed and sealed by him April 21, 1919. Besides all this, in the brief in support of the petition for rehearing, counsel say:

"We draw the attention of the court to the option dated September 15, 1911, from the May Land Company to J. L. Hartman and E. L. Thompson."

With all of these data before us, we know not how to respond to this invitation, except by the examination of the option that appears physically joined to the bill of exceptions. As all of these papers were used before us in the former argument, we feel that under all the circumstances delineated it would be sacrificing substance to form if we declined to consider them in the decision of the case. Therefore, accepting the invitation of counsel for the plaintiffs, we shall consider the option agreement as if it were regularly and properly before us as part of the record on appeal.

7. Respecting contracts of that sort, it is said that:

"An option founded on a consideration is a unilateral agreement binding, from the date of its execution, on the party who executes it; and it becomes a contract *inter partes* when exercised according to its terms. In such a transaction two elements exist: (1) The offer on the one side which does not become a contract until accepted upon the other; and (2) the

completed contract to leave the offer open for a specified time.''; 13 C. J. 336.

It is further defined as:

''A continuing offer, binding for the time specified the one who makes it, but not the one to whom it is made, unless he accepts, when it becomes binding upon both'': *Benedict* v. *Pincus,* 191 N. Y. 377 (84 N. E. 284).

The very term ''option'' indicates choice, not obligation. Such a contract is indeed binding as any contract, but only for what it specifies. As to the optioner who executes the instrument for a consideration, it is an offer made by him to sell upon certain terms which are conditions of his contract, the binding force of which is to restrain him from withdrawing the offer for a certain time. To make it a mutually binding contract compulsory upon the proposed purchaser, the latter must accept the offer according to its terms. Like any other contract based on offer and acceptance, the latter must exactly coincide in all its terms with the former. Until this occurs there is no meeting of minds between the proposer and the accepter, and hence no contract other than the original one binding only upon the man who makes the offer.

Referring, then, to the option, we find that the May Land Company, in consideration of $5,000, ''does hereby give to the parties of the second part, their heirs and assigns, an option, and nothing more than an option, to purchase the following described real property, for the sum of $295,000 on the terms and conditions hereinafter set forth.'' The terms were: $45,000 in cash on or before October 20, 1911; $30,000 on or before October 20, 1912; an additional

$50,000 on or before October 20, 1913; an additional $75,000 on or before October 20, 1914; and the balance of $95,000 on or before October 20, 1915.'' There is no stipulation in any way binding the plaintiffs here to pay those sums of money. Their payment was a condition merely of the option contract which must be met by actual performance, if the plaintiffs would create a situation in which they could compel a conveyance by the author of the option.

Much stress is laid by the plaintiffs in their petition upon these words in the option:

"Said party of the first part hereby agrees that, if the parties of the second part shall exercise the option hereby granted and shall pay to the party of the first part said sum of $45,000 on or before October 20, 1911, the party of the first part will, upon the payment of said $45,000, execute and deliver a deed of conveyance * * to the Title and Trust Company,''

—upon conditions too long to quote, but in substance placing the legal title in the trust company, to hold and to convey to the plaintiffs or their assigns only upon payment of the moneys named in the option. Even yet, there was nothing compelling the plaintiffs to make the payments. The only effect of that clause was to afford them further assurance that the optioner would perform his part of the option and make the conveyance, if the moneys were paid. We read further in the option agreement:

"It is distinctly understood and agreed that time is of the essence of this option, and that the parties of the second part acquire no rights at law or in equity in the title to said property by virtue of the payment herein made, and that said payment is not made on account of the purchase price of said real property, but is a payment made for this option, and

that if said property is not bought in accordance with the terms of this option by the parties of the second part on or before October 20, 1911, then and in that event shall the parties of the second part have no further rights whatever, and the option shall have expired and become null and void.''

With this *résumé* of the option agreement, we return to the contract for the payment of a commission, upon which this action is founded, and which appears as exhibit "A," attached to the original complaint. We find therein this clause:

"It is understood that you [meaning the plaintiffs] are to form a syndicate for the purchase of this land, and when thé sale is negotiated, it will be understood that this five per cent is due and payable on or before four years, providing the one hundred eighty-four thousand dollars ($184,000) is paid as provided in the contract of purchase, on or before the end of four years."

8, 9. That contract, meaning the option agreement, requires certain payments to be made at certain dates; time being of the essence of the stipulation. The theory of the complaint is that the terms of exhibit "A," attached thereto, have been performed in that the option agreement has been strictly observed "as provided in the contract of purchase." In that feature the complaint is traversed, which puts upon the plaintiffs the duty of proving the allegation. In a sense evading the general issue, the plaintiffs allege in their reply, not that the money was paid at the times and in the amounts specified in the option agreement, time being of the essence thereof, but that the Parkrose Association gave its notes due and payable as late as October 20, 1918, three years after the final payment was to be made under the option. Moreover, it appears that $10,000 was not paid, but

is alleged to have been remitted by the May Land Company. In effect, the plaintiffs have alleged in their complaint full performance of the contract upon which the validity of the contract immediately in suit depends, and in their reply rely upon a waiver and extension of time on the option contract. There is no direct allegation that Emanuel May waived the performance of any part of his original agreement upon which the action is founded. It is not stated that May, the individual, dispensed with the condition of his personal agreement that the purchase price of the land should be "paid as provided in the contract of purchase, on or before the end of four years." Nothing else appearing therein, the payments to be made meant the delivery of so much money, not the handing over of some promissory notes. "Paid as provided in the contract of purchase" calls for cash, and that, too, at certain times without abatement in amount: *Moumal* v. *Parkhurst,* 89 Or. 248 (173 Pac. 669).

As stated in *Union Street Ry. Co.* v. *First National Bank,* 42 Or. 606 (72 Pac. 586, 73 Pac. 341):

"It has often been held by this court that the plaintiff must prevail, if at all, upon the matters alleged in his complaint, * * and that he cannot set up one cause of action or suit in the complaint, and recover upon another and different ground of relief alleged in a reply."

See, also, *Bruce* v. *Phoenix Co.,* 24 Or. 486 (34 Pac. 16); *Long Creek Bldg. Assn.* v. *State Ins. Co.,* 29 Or. 569 (46 Pac. 366); *Hannan* v. *Greenfield,* 36 Or. 97 (58 Pac. 888); *Young* v. *Stickney,* 46 Or. 101 (79 Pac. 345); *Cranston* v. *West Coast Life Ins. Co.,* 63 Or. 427 (128 Pac. 427); *Waller* v. *City of New York Co.,* 84 Or. 284 (164 Pac. 959, Ann. Cas. 1918C, 139).

The release, so called, of the plaintiffs, by the May Land Company, from all claims that the company had against the plaintiffs growing out of the sale of said lands, mentioned in the reply, does not affect the case so far as the performance of the contract is concerned, for, as already shown, the plaintiffs were under no obligation to pay anything to the company, but had only the privilege of making payments, which privilege they could exercise or forego as they chose, either in whole or in part.

On the record before us the reply is a plain departure from the cause of action stated in the complaint. Instead of showing performance of their contract as alleged in their primary pleading, the plaintiffs have disclosed a performance of something other and different from the original stipulation, which profits them nothing. It is believed that this elaborates the conclusion, reached by Mr. Justice HARRIS, that the plaintiffs "cannot compel the payment of such commission in this action on the pleadings as they now are." The petition for rehearing is therefore overruled.

REVERSED AND REMANDED.    REHEARING DENIED.

McBRIDE, C. J., and BENSON and HARRIS, JJ., concur.